## LANSTON MONOTYPE MACH. CO. v. PITTSBURGH TYPE FOUNDERS CO.

(District Court, D. Delaware.  July 13, 1921.  Supplemental Opinion, November 18, 1921.)

### No. 399.

**1. Words and phrases—"Lead," "rule," "slug," "point," and "pointwise dimension" defined.**

As used in the printing trade, a "lead" is a strip of metal used to separate lines of type; a "rule" is a thin plate or strip of metal, of the same height as the type, used for printing lines, as in tabular work or between columns of the same page; a "slug" is a thick lead; the "point" is the standard unit of measure of type bodies, it being .0138+, or approximately $1/72$, of an inch; and the "pointwise dimension" of a lead, rule, or slug is its thickness.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Lead; Point; Rule.]

**2. Patents ⬦328—Cutting mechanism for casting machine held not infringed.**

The Bancroft & Indahl patent, No. 1,193,344, claim 13, and the Hockman patent, No. 1,193,388, claims 32 and 38, each for cutting mechanism for machines for casting printer's leads and rules, *held* not infringed.

**3. Patents ⬦328—1,222,415, claims 1 and 2, and 1,237,058, for machine and process for making type-metal elements for printing forms, held not infringed.**

The Knight patents, No. 1,222,415, claims 1 and 2, for apparatus for casting type-metal elements for printing forms, and No. 1,237,058, for the process and product of such casting, *held* not infringed.

In Equity.  Suit by the Lanston Monotype Machine Company against the Pittsburgh Type Founders Company.  Bill dismissed.

Melville Church and Alexander S. Steuart, both of Washington, D. C., and Ward, Gray & Neary, of Wilmington, Del., for plaintiff.

Fay, Oberlin & Fay, of Cleveland, Ohio, and Thomas F. Bayard, of Wilmington, Del., for defendant.

MORRIS, District Judge.  [1] The bill of complaint in this cause charges infringement by Pittsburgh Type Founders Company of letters patent Nos. 1,222,415 and 1,237,058, issued April 10, 1917, and August 14, 1917, respectively, to Amos L. Knight, assignor to Lanston Monotype Machine Company, the plaintiff.  The earlier patent is for a machine to manufacture typographic elements, known as leads, rules, and slugs.  The later one, the application for which was a division of the application for the former, is for the product and the process of such manufacture.  A "lead" is a strip of metal used to separate lines of type in printing.  A "rule" is a thin plate or strip of metal, of the same height as the type, used for printing lines as in tabular work or between columns of the same page.  A "slug" is a thick lead.  The "point" is the standard unit of measure of type bodies; it being .0138+, or approximately $1/72$, of an inch.  The pointwise dimension of a lead, rule, or slug is its thickness, as to which uniformity and exactness is essential.

As to the objects of the invention, the inventor states:

"The principal objects to be accomplished are, first, the casting of the elements in indeterminate lengths adapted to be subsequently severed to form lines, rules, or leads of the desired length for any particular printing form; and, secondly, to permit of the casting of such elements free from cavities or defects, and of accurately proportioned dimensions, to correspond either to the point size of the elements composing the form, or to bear such relation to the same that the elements of the form may be locked up without permitting of any looseness or play of the elements. Other objects of the invention are to provide mechanism which will produce the elements in indeterminate lengths economically and from molten metal such as is commonly employed in the type-casting art for casting type characters, and commonly known as type metal, thus putting it within the capacity of the ordinary printing establishment to produce all of the elements entering into the printing form at such time as the same may be needed and of proper size as to fit the work in hand."

An advantage of making the product of type metal rather than of brass, as formerly, is that the articles constituting the product may be returned to the melting pot with the type, instead of being picked out by hand from the type form, and results in what has become known, in the printing art as a "nondistribution" system.

With respect to the machine the specification says that "the apparatus adopted for illustrating the invention is one designed more especially for use in connecting with a monotype casting machine;" and adds:

"But it will be understood that the invention may be incorporated in a machine designed for the special function of casting elements of printing forms, without having incorporated therein the refinements of mechanism embodied in the monotype casting machine for producing accurately justified lines of type, and therefore the present invention is susceptible of embodiment in a comparatively simple machine."

The principal characteristics of the machine described in the patent are the *mold*, in which the product is cast in successive increments, each increment as cast being joined by fusion to the preceding one; the *pump*, which forces the molten type metal from the melting pot into the mold; and the feeding mechanism, consisting of a mold blade or thrust rod, which pushes the product toward and out of the exit end of the mold cavity, step by step, as each succeeding increment congeals and becomes fused to the preceding increment. The mold, which is above the melting pot, is a built-up structure having a bottom or mold base through which the molten metal is injected into the mold cavity; a top, formed by a matrix or part which gives shape to the upper surface of the element being cast; two parallel sides, or type blocks, between whose extended ends are placed point blocks which determine the width of the mold cavity and consequently the point size of the element being cast; and a rear end wall, formed by the forward end of the mold blade when retracted.

To retain within the mold cavity the first injection of molten metal until it becomes congealed, the exit opening at the other end of the mold is closed by inserting therein, before the machine is started, a section of product previously made. When the first injection of molten metal becomes congealed, and fused to the inserted section of finished product, the mold blade advances and pushes the rear end of the congealed increment to the exit opening of the mold cavity; the rear end

of each succeeding increment in turn constituting the front wall of the mold during the formation of the next increment. The mold blade, after pushing forward a congealed section, is immediately retracted. A new charge of molten metal is injected into the mold cavity as the mold blade retracts, or after it has been retracted. The metal in the mold is chilled by water circulating through channels in the bottom and sides of the mold. A pressure screw bears upon the type block forming the front side wall of the mold, and is so operated as to press the type blocks tightly against the separating point blocks during the casting operation and to release such pressure during the forward feeding of the product. There is also at one side of the mold cavity a channel and opening in the type block, through which the air from the mold cavity may escape at each injection of the molten metal. The small quantity of metal which escapes with the air forms a thinly connected projection on the side of the cast element. This projection is sheared off by a stationary knife, and drops into the melting pot as the cast element is fed forward.

The pump is immersed in the molten metal in the melting pot, and forcibly injects the separate charges of metal into the mold cavity through a nozzle and nozzle opening in the mold base; the nozzle opening being located immediately behind the rear end of the congealed increment in its advanced position. The pump is actuated in coordination with the reciprocating mold blade, so that there is one stroke of the pump for each complete reciprocation of the mold blade.

The machine claims in suit, being 1 and 2 of patent No. 1,222,415, are:

"1. An apparatus for casting type metal elements for printing forms, embodying means for confining molten metal, in contact with a surface of a previously congealed portion of the element being cast whereby the two portions are caused to unite by fusion, means for intermittently advancing the element with relation to the confining means as succeeding increments congeal, and means for forcibly injecting molten metal within the confining means to form succeeding increments of the element.

"2. An apparatus for casting type metal elements for printing forms embodying means for confining a body of molten metal in contact with a surface of a previously congealed portion of the element being cast, whereby the two portions are caused to unite by fusion, means for intermittently advancing the element as succeeding increments congeal, means for intermittently injecting molten metal within the confining means, and means for directing the incoming metal along the face of the previously congealed portion of the element."

The specification of patent No. 1,237,058 states that the form of apparatus described in patent No. 1,222,415 may be employed for carrying out the process and producing the article forming the subject-matter of the later patent, and adds:

"In the practical making of the strip material of the present invention it was found to be of great importance, especially with strip material provided with a printing surface, to follow a process in which, generally set forth, the molten type metal is forced into a suitable cavity, one of the walls of which constitutes a matrix or die to determine the facial characteristics of the finished strip, the metal when congealed being fed forwardly to permit the entry of the next increment and to close the exit of the cavity, the above operations being repeated successively to produce a strip of the desired length."

The claims in suit for the process, being 4 and 6 of patent No. 1,237,-058, are:

"4. The method of forming a distinctive finished strip of material for use in a form of printing type which consists in intermittently forcing increments of molten metal into a mold cavity the exit to which is closed by the congealed metal forming the strip, intermittently feeding the metal forwardly through the exit of the mold cavity and in causing the molten metal to congeal in the mold cavity during the intervals between feed movements."

"6. The method of forming a distinctive finished continuous strip of metal for use in a form of printing type, which consists in intermittently forcing molten type metal into a mold cavity the exit to which is closed by the congealed metal of a previous increment, causing the succeeding increments to unite by fusion, intermittently feeding the metal forwardly through the exit .of the mold cavity and in causing the molten metal to congeal in the mold cavity during the intervals between feed movements."

With respect to the product the later patent says:

"The product of such process is, as will be readily understood, a strip of type metal of definite width and depth and of indefinite length, which is formed of successively congealed sections fused together to form an integral structure. Each section after congealing becomes melted in the region of the end thereof which forms the end wall of the mold, by contact with the molten metal subsequently injected, and the melted portion of the congealed · section and the injected molten metal thereafter congeal to form a new section fused to the previously congealed section."

While the application for the later patent was pending in the Patent Office it was amended by the addition, among other things, of the following:

"The lead or rule strip which is produced by the process described is, when it issues from the machine, a distinctive finished product; that is to say, it is a strip which is of the proper transverse dimension, for use in a form of printing type. The face or that edge which corresponds to the face of the type is a cast face and the surfaces of the strip at the sides are cast surfaces which in appearance and function correspond substantially to the appearance and function of the face and surfaces of ordinary undressed cast type, and consequently require no planing, dressing or finishing, either to give the proper transverse dimension or face or surface finish. The strip product is thus sharply distinguished from prior lead and rule strip material which, as heretofore made by the rolling extrusion or machining processes, invariably presented surfaces which were not cast surfaces but were dressed surfaces. * · * * The several increments or sections which go to make up the complete strip are congealed in the mold cavity successively and merge one into the other by a process of fusion."

The product claims in suit, being 1 and 2 of patent No. 1,237,058, read as follows:

"1. A finished type metal strip to form a lead or rule element in a form of printing type, composed of successively congealed sections of metal merged by fusion one into the other with finished cast side surfaces showing the sectional formation and with a cast face.

"2. A finished type metal strip to form a lead or rule element in a form of printing type, composed of successively congealed increments of metal forming sections each with finished cast side surfaces showing the sectional formation and with a cast face, the several sections being merged one into the other to form an element of any desired length."

The defendant does not deny the presence of invention in plaintiff's patented product, process, and machine, but contends that, when the

claims are interpreted in the light of the prior art, defendant's product, process, and machine cannot be regarded as infringements.

Defendant's machine has a melting pot, a pump, a mold or forming die, and a feeding mechanism operating as a draw blade. The bottom of the melting pot is on the same horizontal plane as the bottom of the cavity in the mold or die. The pump is located in the melting pot. The molten metal flows from the melting pot into the pump chamber through a small opening located in the surrounding cylinder at a point just below the bottom of the piston when in its elevated position. The pump chamber is connected with the mold or die cavity by a throat or channel, the bottom of which is on a horizontal plane slightly below that of the bottom of the mold or die cavity. The function of the pump is to inject molten metal into the mold or die cavity. The mold or die has a top, bottom, two parallel sides, and a rear end wall, all rigidly fastened together. Inclosed therein is a cavity, the inlet to which is through the bottom part of the rear end wall of the mold. The inlet or nozzle is relatively small in cross-section. The exit of the mold cavity is at the forward end of the mold. The cross-sectional dimensions of the cavity correspond with and depend upon the height and point size of the strip to be formed therein. The mold is approximately four inches long. The molten metal is chilled in the mold by the circulation of water in a surrounding jacket. The mold is removable; each mold being so designed as to make elements of one size only. The mold cavity is open at its exit end to permit the outward feeding of the strip as it is formed.

Before starting the machine this opening is closed in the same manner as is the similar opening in plaintiff's mold. During the operation of the machine this exit is continuously closed by the congealed metal forming the strip as in plaintiff's mold. There is no air vent in the mold or die, as during operation the air is excluded from the cavity therein by the congealed strip closing the exit and by the molten metal, which continuously fills the channel leading from the pump cylinder in the melting pot to the inlet in the rear end of the mold or die. Consequently there is no fin to be sheared from the product. The feeding means operates as a draw blade. There is a withdrawal movement of the feeding device for every stroke of the pump. In the normal operation of the machine the downward stroke of the piston synchronizes with the pulling movement of the draw blade. The injection of the metal into the mold or die cavity and its withdrawal therefrom is intermittent. The injection, being aided by pump action, is likewise forcible. The forcible injection of the metal through the inlet, the bottom of which is on a level with the bottom of the mold cavity, would seem effective to produce a swirl of molten metal in the mold sufficient for directing the incoming metal along the face of the previously congealed portion of the element. The withdrawal movements are made at the rate, approximately, of one per second, between which there is a relatively long period of rest, to permit the newly injected molten metal to congeal in the mold or die cavity. The product is type metal elements for printing forms. With respect to the feeding means I think the draw blade of

·defendant's machine an equivalent of the mold or thrust blade of plaintiff's.

Each of the elements of the machines covered by the mechanism claims in suit would seem to be present in defendant's machine, and each of the steps of plaintiff's process covered by the claims therefor in suit would seem to be present in defendant's process. The defendant contends, however, that the term "mold" designates a rigid matrix or body frame provided with a mold cavity adapted to receive an isolated charge of molten or plastic material, and adapted to confine and shape that charge to the definite form and pattern of that cavity while the material hardens and becomes self-sustaining; that the embodying means of the Knight patents for confining molten metal is such a mold, and that, in view of the specification and the prior art, the claims of those patents must be limited to such embodying means. It further contends that defendant's machine does not have a mold, but that in lieu thereof it has a matrix or die opening that determines merely the cross-sectional shape of the strip; that there is always a continuous uninterrupted passage or opening from the pump chamber in the melting pot to the exit end of the die which, during operation, is always filled with an unbroken mass of metal that progressively changes from the molten to the solid state; that by reason thereof there is in the latter machine never at any stage of operation a mold cavity, or closed space, into which a charge of molten metal is injected or cast, and that therein lies an essential distinguishing feature between the two machines.

I am unable to agree with the defendant in its theory that its mold or forming die is always filled with an unbroken mass of metal. The withdrawal of the element or strip is intermittent, not continuous. The withdrawal movements are begun when the metal in the mold or die cavity is in a state of rest. They are sudden and abrupt. The movement thus given to the congealed element necessarily stops at the rear end of the solid material. It is not communicated to the molten metal beyond, then in a state of rest. ·The force that gives movement to and advances the molten metal at the rear of the congealed element is not that of the withdrawal device, but is the pump pressure, supplemented possibly by gravity. However quickly this force may change the molten metal from a state of rest to a state of motion, the changed state cannot occur until the congealed element moves, and its movement is sudden and abrupt. The result, as I view it, is a breach of continuity in the metal in the mold at each withdrawal movement; the breach occurring along an irregular line constituting the boundary between the solidified and the molten mass. This conclusion is fortified, I think, by the arrow head markings on defendant's product, which seem to me ·to be lines or zones of fusion corresponding with the conformation of the rear end of each section of the congealed metal when fed forward. The breach of continuity and the fusion are, I think, both well illustrated by the sectional markings on the top and bottom faces of the strips, defendant's exhibit No. 31, made with the pump cam so adjusted as to make the pump action alternate with the drawing action. The markings on a strip of given length are equal in number to the with-

drawal movements imparted to that strip. It follows, I think, that the change of the metal from the molten to the solid state is not progressive, as defendant contends, and as it probably would be, were the withdrawal from the mold or die cavity continuous and at a uniform rate of speed, but is incremental and sectional.

Nor am I able to agree with defendant's contention that there is not in its machine at any stage of operation a mold cavity, or closed space, into which a charge of molten metal is injected or cast. Whatever the defendant's confining means may be called, it contains a cavity. The metal incrementally solidified by casting and united by fusion is intermittently withdrawn from a portion thereof as succeeding increments congeal. The fact that the portion of the cavity so vacated is filled as it is vacated, instead of after completed vacation, does not seem to me to warrant defendant's conclusion.

I have examined the patents put in evidence by the defendant as illustrating the prior art. Even in the light thereof, I think that defendant's operation is an incremental casting operation, not a drawing one, and that defendant's mold performs the same function in substantially the same way as does that of plaintiff. Hence I find claims 1 and 2 of patent No. 1,222,415 and claims 4 and 6 of patent No. 1,237,058 valid and infringed.

The product of defendant's machine is, if the previous findings herein be correct, a finished type metal strip to form a lead or rule element in a form of printing type, composed of successively congealed sections of metal merged by fusion one into the other, with finished side surfaces showing the sectional formation with a cast face. To this extent defendant's element is the product described in the product claims in suit. Each of those claims, however, gives an additional feature to the product covered thereby, namely, cast side surfaces. The term "cast" must be construed in the light of the description in the specification. The amendment thereto, above quoted, shows that the term signifies having the appearance of an undressed cast surface, in contradistinction to a dressed surface. This is illustrated by figures 7 and 8 of the patent. As the claims are thereby expressly limited to a product having undressed cast side surfaces, such side surfaces are an indispensable feature of the product covered by the claims in suit. If the defendant has in its product succeeded in dispensing with this feature it does not infringe those claims.

That the defendant has dispensed with that feature is made clear, I think, by burnishing the sides of plaintiff's element, whereupon it presents an appearance much more nearly like the side surface of defendant's element than it does before such burnishing. Consequently, I find claims 1 and 2 of patent No. 1,237,058 not infringed. The difference in side surface appearance between the product of the defendant and that of the plaintiff is accounted for, possibly, by the fact that each increment of defendant's element is cast very near the rear end of the mold cavity, which is, in length, four or five times that of an increment. The passage of each increment, after it is cast, between the tightly confining walls of a cavity of such length, may burnish or

dress the side surfaces of defendant's product. While this step of defendant's process is not present in plaintiff's process, yet the defendant, having used each step of plaintiff's process, may not, by the use of an additional step, escape the charge of infringement. Nor does the fact that defendant's mold performs a burnishing function in addition to its casting function make defendant's machine any less an infringement of plaintiff's.

[2] The defendant's machine has also a mechanism for cutting off the formed elements in such lengths as may be desired. The bill of complaint alleges that this mechanism infringes letters patent No. 1,193,344, granted August 1, 1916, to J. S. Bancroft and M. C. Indahl, assignors to plaintiff, and No. 1,193,388, granted on the same day to C. C. Hockman, likewise assignor to plaintiff. The claims in suit are 13 of the former patent and 32 and 33 of the latter patent. They are:

"13. In apparatus for producing printers' leads and rules, the combination with means for casting and feeding a lead or rule strip of indeterminate length, of a cutter carriage movable in unison with the strip, a gage rod movable with the carriage, a gage adjustably mounted on said rod and projecting in the path of the end of the strip, a transversely movable cutter mounted in the carriage, and operating mechanism for advancing the cutter when set by the gage."

"32. The combination with a casting mechanism, of a cutting mechanism, movable elements constituting a part of the casting mechanism and moving in unison therewith, and means for bringing the cutting mechanism into operative connection with said movable elements at intervals whereby said elements actuate the cutter."

"33. The combination with a casting mechanism, of a cutting mechanism, members constituting an actuating means between the casting mechanism and the cutting mechanism whereby the latter is operated by the former, said members being normally out of engagement with each other, and means for establishing a connection between said members at intervals."

Defendant's counsel have not contended that those claims are invalid, nor have they in argument or brief made any reference to the prior art discussed by defendant's expert. They contend, simply, that one of the elements of each of those claims is missing from defendant's machine. They point out that in the mechanism of both of those patents the movable element, constituting a part of the strip forming mechanism and moving in unison therewith, does not, as in defendant's machine, operate directly upon the head of the transversely movable cutter mounted on the movable cutter carriage when the cutter carriage is advanced by the strip, but actuates the cutter through intervening mechanism. They point out that such intervening mechanism is called for by each of the claims in suit—in claim 13 as "operating mechanism for advancing the cutter when set by the gage," in claim 32 as a "means for bringing the cutting mechanism into operative connection" with movable elements constituting a part of the casting mechanism, and in claim 33 by substantially identical language. I think the absent mechanism is called for by the claims, and, one element of the combination of the claims not being found in defendant's machine, I find claim 13 of patent No. 1,193,344 and claims 32 and 33 of patent No. 1,193,388 not infringed.

A decree in conformity herewith may be submitted.

## Supplemental Opinion.

### (After Reopening Case and Additional Proofs.)

[3] One of the findings made in the original opinion was that a breach of continuity in the metal passing through defendant's mold occurred at each withdrawal movement. As defendant's mold was made wholly of metal, this finding was, of course, pure deduction. After the filing of the original opinion, the defendant succeeded in making a mold with a glass, or pyrex, window. Upon a petition setting forth both this fact and the further fact that defendant, before final hearing, made numerous and prolonged, but unsuccessful, efforts looking to this end, the cause was reopened on the original pleadings, to enable defendant to submit to the court an ocular demonstration of the behavior of the metal in its mold. The demonstration has been had. A window was first placed in the side of the mold next to the observer. A strong light was thrown upon it. A subsequent demonstration was made with a window in each side of the mold. In the latter demonstration a light of high candle power was placed at the far side of the mold. The rays of light, other than those that might pass through the windows of the mold and the breaches of continuity, if any, in the metal within the mold, were diverted from the observer by a funnel-shaped box or inclosure leading from his eyes to the window in the near side of the mold. The machine was operated under each of these conditions. The evidence does not disclose that any observer discerned under these conditions any breach of continuity in the metal within the mold. None was observed by the court. While in these experiments, by reason of the slower congelation brought about by the decreased size of the cooling jacket made necessary by the windows in the mold, the length of draw and consequently the output of product within a specified time was greatly reduced, yet the speed and abruptness with which the solidified portion of the lead or rule was put in motion at each withdrawal movement was the same as in the normal operation of the machine. At the rehearing it was also pointed out that the arrow-head markings of defendant's product do not extend through the lead or rule, but are to be found only upon its surface. This indicates, I take it, that, while the molten metal in the mold may become attenuated by the withdrawal movement, yet no complete breach therein occurs. Under these circumstances I am constrained to conclude that theory must give way to demonstration, and that in the operation of defendant's machine there is no breach of continuity in the metal within defendant's mold during the normal operation of its machine.

Claims 1 and 2 of patent No. 1,222,415 call for an apparatus for casting type metal elements for printing forms, for confining (a body of) molten metal in contact with a surface of a previously congealed portion of the element being cast, "whereby the *two* portions are caused to *unite* by *fusion*. * * *" One of the steps in claim 6 of patent No. 1,237,058 is "causing the succeeding increments to *unite* by *fusion*." Each of these claims either expressly calls for or necessarily presup-

poses, among other things: (a) "Two" masses, bodies, or increments of metal; (b) that such increments should "unite"; and (c) "by fusion." Unless the stream of metal in defendant's machine is broken in its mold, there are not at any time "two" masses, bodies, or increments of metal in its machine, but only one unbroken, continuous mass. Unless the stream of metal in defendant's machine is broken in its mold, there are not at any time separate masses, bodies, or increments of metal to be "united." Unless the stream of metal in defendant's machine is broken in its mold, there are not at any time two masses, bodies, or increments of metal to unite "by fusion." The meaning of "fusion," as used in the claims, may be stated in the language of the inventor, found at page 1, lines 47–56, of patent No. 1,237,058, thus:

"The product of such process is, as will be readily understood, a strip of type metal of definite width and depth and of indefinite length, which is formed of successively congealed sections fused together to form an integral structure. Each section, after congealing, becomes melted in the region of the end thereof which forms the end wall of the mold, by contact with the molten metal subsequently injected. * * *"

It is clear that "fusion," as thus used, does not mean the mere rendering fluid by heat, but means the union by heat of two separate masses or increments. In the absence of a breach of continuity in the stream of metal within defendant's mold, there is no opportunity for fusion therein, such as occurs in plaintiff's mold and as is called for by the claims. Consequently I deem a breach of continuity of the metal within defendant's mold an indispensable prerequisite to infringement by defendant's machine and process of claims 1 and 2 of patent No. 1,222,415 and claim 6 of patent No. 1,237,058.

Claim 4 of patent No. 1,237,058 was a substitute for a prior claim 4 rejected by the Patent Office upon Illingsworth patent No. 473,579. The rejected claim reads:

"4. The method of forming a relatively thin and broad strip of type metal for use in a printing form, which consists in casting the same in successive sections with the rear edge of a preceding section in direct contact with the molten metal of the succeeding section and causing the edges of the sections to fuse together, due to the inherent heat of the metal being cast."

Manifestly the present claim 4 may not be given the same meaning as the rejected claim, and consequently may not be construed so as to permit the congealed section to be at all times "in direct contact with the molten metal of the succeeding section." Hence I deem a breach in the continuity of the metal within defendant's mold likewise an indispensable prerequisite to infringement of claim 4 of patent No. 1,-237,058. Not finding such breach of continuity, I am of the opinion that claims 1 and 2 of patent No. 1,222,415 and claims 4 and 6 of patent No. 1,237,058 are not infringed by defendant's machine and process. The bill of complaint must therefore be dismissed.

A decree accordingly may be submitted.